2004 UT 107

Richard C. THOMPSON and Paul C. Jensen on behalf of themselves and all other similarly situated taxpayers, Plaintiffs and Appellants,

v.

UTAH STATE TAX COMMISSION, Pam Hendrickson, R. Bruce Johnson, Palmer DePaulis, and Marc B. Johnson, as Commissioners of the Utah State Tax Commission, and the Utah State Retirement System, Defendants and Appellees.

No. 20030506.

Supreme Court of Utah.

Dec. 28, 2004.

Gary A. Dodge, Kevin W. Bates, Salt Lake City, for plaintiffs.

Mark L. Shurtleff, Att'y Gen., John C. McCarrey, Timothy A. Bodily, Asst. Att'y Gen., Salt Lake City, for State Tax Commission and Commissioners Kevin A. Howard, Gregory D. Phillips, Daniel D. Anderson, David B. Hansen, Salt Lake City, for State Retirement System.

PARRISH, Justice:

¶ 1 In 1989, the United States Supreme Court decided *Davis v. Michigan Department of the Treasury*, in which it applied the intergovernmental tax immunity doctrine to strike down a Michigan statute that exempted from taxation the retirement benefits of state, but not federal, employees. 489 U.S. 803, 817, 109 S.Ct. 1500, 103 L.Ed.2d 891 (1989). The *Davis* decision also rendered invalid similar tax exemptions in a number of other states, including Utah. In response, Utah eliminated its tax exemption for the retirement benefits of Utah state employees and simultaneously increased their retirement benefits. A group of federal retirees filed suit, arguing that Utah's benefits increase is, in reality, an unlawful tax rebate that runs afoul of intergovernmental tax immunity principles just like the tax exemption it replaced. The district court dismissed the lawsuit under rule 12(b)(6) of the Utah Rules of Civil Procedure, and the retirees appealed.

Because we conclude that Utah's increase in benefits to state retirees is permissible under *Davis*, we affirm.

## BACKGROUND

 ¶ 2 In reviewing a grant of a motion to dismiss under rule 12(b)(6), "we accept the factual allegations in the complaint as true and consider them and all reasonable inferences to be drawn from them in a light most favorable to the plaintiff." *St. Benedict's Dev. Co. v. St. Benedict's Hosp.*, 811 P.2d 194, 196 (Utah 1991). We state the facts accordingly.

¶ 3 The intergovernmental tax immunity doctrine is rooted in the Supremacy Clause of the United States Constitution. *See generally McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 4 L.Ed. 579 (1819). It is codified at 4 U.S.C. § 111, which states, in relevant part:

> The United States consents to the taxation of pay or compensation for personal service as an officer or employee of the United States ... by a duly constituted taxing authority having jurisdiction, *if the taxation does not discriminate against the officer or employee because of the source of the pay or compensation.*

4 U.S.C. § 111(a) (2004) (emphasis added). In other words, states cannot discriminate against federal employees with regard to taxation based on their status as federal employees.

¶ 4 The United States Supreme Court applied the intergovernmental tax immunity doctrine in *Davis*. In that case, a retired federal employee challenged a Michigan statute that exempted from state tax the retirement benefits of Michigan state employees but nevertheless taxed retirement benefits paid by other employers, including the federal government. *Davis*, 489 U.S. at 805–07, 109 S.Ct. 1500. The Court held that Michigan's tax exemption discriminated against federal employees and therefore violated the intergovernmental tax immunity doctrine. *Id.* at 817, 109 S.Ct. 1500.

¶ 5 The *Davis* Court suggested that states like Michigan which had exempted their employees' retirement benefits from state taxation could "comply with the mandate of equal treatment" by either eliminating the offending exemption or offering a similar exemption to retired federal employees. *Id.* at 818, 109 S.Ct. 1500. From the states' perspective, however, neither option was ideal. Eliminating the exemption would result in a substantial, de facto cut in state employees' pay, while extending the exemption to federal employees would substantially reduce state tax revenues.

¶ 6 Utah selected the first option. On September 19, 1989, the Utah legislature passed a bill, effective January 1, 1989, retroactively eliminating the exemption for state employees' retirement benefits. 1989 Utah Laws, ch. 7, 2d Spec. Sess. Two days later, the legislature passed a bill entitled "Retirement allowance increase to offset tax liability—Administration," giving qualified retirees a three percent increase in their retirement allowance. 1989 Utah Laws, ch. 8, 2d Spec. Sess.; Utah Code Ann. § 49–11–701(1)–(2) (2002).[1] The benefits increase was designed to remedy, at least in part, the de facto pay cut state employees sustained with the elimination of the exemption. Both bills were approved on the same day. 1989 Utah Laws, ch. 7–8, 2d Spec. Sess. Only state retirees who had been members of the retirement system and were entitled to a tax exemption prior to 1989 qualified for the benefits increase, which was to be funded by contributions. Utah Code Ann. § 49–11–701(1), (6). Eligibility for the exemption was not contingent upon residency in Utah. *See id.* § 49–11–701.

¶ 7 After the legislature passed section 49–11–701, a group of federal retirees (the "retirees") residing in Utah filed amended tax returns with the Utah State Tax Commission (the "Commission"), claiming entitlement to refunds for overpayment of state taxes. When the Commission refused to grant the requested refunds, the retirees sued the Commission, challenging Utah's retirement benefits scheme on behalf of themselves and

---

**1.** Before 2002, the provisions governing this retirement allowance increase were found at Utah Code section 49–1–701 (1998). In this opinion, we refer to the statute's current location, Utah Code section 49–11–701 (2002).

all other similarly situated taxpayers. The retirees alleged that Utah's benefits increase simply disguised the previous tax exemption as compensation and therefore violated the intergovernmental tax immunity doctrine as set forth in *Davis,* just as the former tax exemption did.

¶ 8 The Commission moved to dismiss the retirees' suit under rule 12(b)(6) of the Utah Rules of Civil Procedure, arguing that *Davis* acknowledged states' rights to determine their employees' compensation levels and that the retirees had therefore failed to state a claim upon which relief could be granted. The Utah State Retirement Board (the "Board") was then joined as a party, and the retirees filed an amended complaint naming the Board as a defendant. The Board, like the Commission, opposed the retirees' suit and joined the Commission's motion to dismiss. After hearing from all parties, the district court granted the motion to dismiss. The retirees appealed. We have jurisdiction under Utah Code section 78–2–2(3)(j) (2002).

## ANALYSIS

¶ 9 The issues presented by this appeal are purely legal in nature. Accordingly, we review the district court's decision for correctness, without deference. *St. Benedict's Dev. Co.,* 811 P.2d at 196.

¶ 10 The retirees read *Davis* to preclude not only discriminatory tax exemptions for state retirement benefits, but also any retirement benefits increases designed to compensate state employees for the loss of such exemptions. They argue that any difference between Utah's benefits increase and the exemption *Davis* invalidated is merely formalistic because Utah continues to favor its employees by giving them the same amount of money as it would have allowed them to keep under the tax exemption. Utah should not be allowed to continue to discriminate against federal employees with respect to the taxation of retirement benefits, the retirees contend, simply by calling its scheme a "benefits increase" and giving money to state employees rather than declining to demand it in taxes. The State, in turn, reads *Davis* as

prohibiting only discriminatory tax exemptions for retirement benefits and not higher levels of compensation for retired state employees, thereby leaving the State free to compensate its employees at levels of its own choosing. Under the State's reading of *Davis,* increasing state employees' retirement benefits, even if motivated solely by a desire to compensate for the elimination of a tax exemption, does not violate the intergovernmental tax immunity doctrine.

¶ 11 We agree with the State's reading of *Davis.* The plain language of 4 U.S.C. § 111, which *Davis* interpreted, prohibits only discriminatory taxation; it does not restrict states' ability to compensate their employees. 4 U.S.C. § 111(a). Additionally, we find nothing in *Davis* even remotely suggesting that a state cannot compensate its employees at whatever rate it sees fit, even if that compensation is motivated by a desire to place its employees in the position they would have occupied but for the elimination of the prior tax exemption. Here, the Utah legislature "compl[ied] with the mandate of equal treatment" by abolishing the tax exemption for state employees' retirement benefits—one of the two options the *Davis* decision contemplated. 489 U.S. at 818, 109 S.Ct. 1500. Utah now taxes all retirement benefits equally. It therefore complies with the intergovernmental tax immunity doctrine in general and with *Davis* in particular.

¶ 12 Our reading of *Davis* is consistent with that of other courts that have considered this issue. For instance, the South Carolina Supreme Court recently held that

> *Davis* does not hold, nor does it even suggest, that a state is prohibited from adjusting the compensation of its employees, even if the state's purpose is to compensate its employees for the loss of the income tax exemption. . . . *Davis* requires that the state *tax* federal and state retirees equally and does not concern itself with the manner in which a state chooses to *compensate* its retirees.

*Ward v. State,* 356 S.C. 449, 590 S.E.2d 30, 33 (2003).[2] Similarly, a Virginia court noted

2. On October 4, 2004, the United States Supreme Court denied certiorari in *Ward v. South Car-* olina, —— U.S. ——, 125 S.Ct. 31, 160 L.Ed.2d 10 (2004).

that "the [*Davis* ] majority took no issue with a state's ability to lawfully increase the benefits paid to state retirees to offset the effect of the Court's holding." *Almeter v. Va. Dep't of Taxation,* 53 Va. Cir. 429, 431, 2000 WL 1687589 (2000). That court also stated that benefits increases were "specifically contemplated and condoned by the Supreme Court of the United States in *Davis."* *Id.* at 432. We agree.

¶ 13 As explained above, the *Davis* majority held that exempting state, but not federal, employees' retirement benefits violated the intergovernmental tax immunity doctrine. Justice Stevens, in dissent, responded to the majority's conclusion by arguing that exempting state employees' retirement benefits from state taxation is not improper because a state can unquestionably and properly achieve the same result simply by increasing those benefits. He wrote:

> [I]t is peculiarly inappropriate to focus solely on the treatment of state governmental employees. The State may *always compensate in pay or salary for what it assesses in taxes.* . . . It trivializes the Supremacy Clause to interpret it as prohibiting the States from providing through this limited tax exemption what the State has an *unquestionable right to provide through increased retirement benefits.*

*Davis,* 489 U.S. at 824, 109 S.Ct. 1500 (Stevens, J., dissenting) (emphasis added). Essentially, Justice Stevens argued that a state may provide its employees the same compensation by either exempting state retirement benefits from state taxation or simply increasing those benefits; because a state may "unquestionably" augment the retirement benefits it provides, it may also exempt state retirement benefits from state taxation.

¶ 14 The *Davis* majority responded to Justice Stevens' dissent by explaining that a tax exemption, unlike an increase in retirement benefits, would adversely affect the federal treasury. Like Justice Stevens, however, it acknowledged the states' ability to increase the benefits paid to their retirees. It stated:

> We also take issue with the dissent's assertion that "it is peculiarly inappropriate to focus solely on the treatment of state governmental employees" because "[t]he State

may always compensate in pay or salary for what it assesses in taxes." In order to provide the same after-tax benefits to all retired state employees by means of increased salaries or benefit payments instead of a tax exemption, the State would have to increase its outlays by *more* than the cost of the current tax exemption, since the increased payments to retirees would result in *higher federal income tax payments* in some circumstances. This fact serves to illustrate the impact on the Federal Government of the State's discriminatory tax exemption for state retirees. *Taxes enacted to reduce the State's employment costs at the expense of the federal treasury are the type of discriminatory legislation that the doctrine of intergovernmental tax immunity is intended to bar.*

*Id.* at 815 n. 4, 109 S.Ct. 1500 (emphasis added) (alteration in original).

¶ 15 Put more simply, the *Davis* majority reasoned that it is cheaper for a state to exempt retirement benefits from state taxation than it is to increase those benefits because benefits increases, unlike state tax exemptions, are subject to federal tax. Were states allowed to exempt retirement income from state taxation, the federal government would lose tax revenue to which it otherwise would have been entitled. As a result, the tax exemption is discriminatory because it transfers to the federal government a portion of the state's cost of compensating its employees. This is a clear violation of the intergovernmental tax immunity doctrine, which "is based on the need to protect each sovereign's governmental operations from undue interference by the other." *Id.* at 814, 109 S.Ct. 1500.

¶ 16 The *Davis* majority's rationale for striking down the Michigan tax exemption implicitly condones benefits increases as a means of compensating state employees because such increases are theoretically taxable by the federal government and therefore do not allow states to profit at the expense of the federal treasury. Moreover, the *Davis* majority failed to attack the dissent's underlying premise that states are always free to set the level of compensation for state em-

ployees. The *Davis* majority and dissent therefore agree that a state may compensate its employees for the lost tax exemption through benefits increases.

¶ 17 The retirees rely heavily on *Sheehy v. Public Employees Retirement Division*, 262 Mont. 129, 864 P.2d 762 (1993), and *Vogl v. Department of Revenue*, 327 Or. 193, 960 P.2d 373 (1998), both of which invalidated benefit-raising schemes enacted in response to *Davis*. The courts in those cases examined how closely the increased compensation given to state employees matched, dollar for dollar, the exemption *Davis* invalidated, with an eye to determining whether the increased retirement benefits were really just tax rebates in disguise. *See Sheehy*, 864 P.2d at 768; *Vogl*, 960 P.2d at 380. Additionally, in *Vogl* the Oregon Supreme Court analyzed the Oregon legislature's intent in enacting the benefits increase to determine whether it was designed to specifically remedy the economic impact of *Davis* on state employees. 960 P.2d at 380.

¶ 18 We are unpersuaded by *Sheehy* and *Vogl* because we do not interpret *Davis*, as they do, to require either a dollar-for-dollar accounting of any increase in retirement benefits or an analysis of the legislature's purpose in enacting the increase in benefits. The exemption at issue in *Davis* was unconstitutional not because it resulted in a benefit to state employees, but because it shielded state employees' compensation from federal tax. No matter how specifically targeted to return to state employees every dollar *Davis* took away, benefits increases are always subject to federal tax laws and are therefore distinguishable from tax exemptions.

¶ 19 Were we to accept the assumption underlying the *Sheehy* and *Vogl* interpretations of *Davis* and consider the motivation and practical effect of Utah's retirement benefits increase, we would nevertheless conclude that it is, in fact, a legitimate benefits increase rather than an impermissible tax rebate. The schemes under scrutiny in *Sheehy* and *Vogl* are readily distinguishable from the one at issue here. Before discussing the distinctions between those cases and this case, however, we reiterate that *Davis* does not require an analysis of the purpose,

intent, or effect of a benefits increase enacted in place of a tax exemption. While we discuss those factors as a means of thoroughly addressing the retirees' arguments, the result we reach in this case turns solely on our reading of *Davis*.

¶ 20 In *Sheehy*, the Supreme Court of Montana invalidated the benefits increase at issue, finding that it was, in fact, an impermissible tax rebate because (1) the benefits increase and the exemption it replaced were components of the same bill; (2) Montana provided the benefit only to Montana residents; and (3) the increase was funded from Montana's general fund rather than employer and employee contributions, as were other retirement benefits. 864 P.2d at 767–68. In contrast, Utah's benefits increase is provided for all Utah state retirees, not just those residing in Utah. *See* Utah Code Ann. § 49–11–701(1). Moreover, the funding of Utah's benefits increase is based on actuarially set contribution rates certified annually by the Utah State Retirement Board, not through separate legislative appropriation based on retirees' increased tax obligations. *Id.* § 49–11–701(6). We recognize that the bill revoking the exemption and the bill increasing retirement benefits were products of the same legislative session, were passed within two days of each other, were approved on the same day, and related to provisions in the same title and chapter of the Utah Code. Nevertheless, when measured against the mechanics and effects of the increase itself, those facts do not persuade us that the benefits increase was really a tax rebate.

¶ 21 Similarly, in *Vogl*, the Oregon Supreme Court invalidated the benefits increase at issue on the ground that (1) its "design and effect" suggested an intent to "offset, dollar for dollar, the amount lost to the exemption repeal"; (2) it provided that employees eligible to receive retirement benefits do not have a vested right in those increased benefits, as they would were the increase a form of compensation rather than a tax rebate; and (3) the statute explicitly stated that the increase was "in compensation for damages" arising from the revocation of the tax exemption. 960 P.2d at 380. In contrast, Utah's benefit enhancement bears

no relationship to the structure of its state tax. Utah's income tax rate, while graduated, is seven percent at its highest bracket, Utah Code Ann. § 59–10–104 (Supp.2004), while the benefits increase provides all qualified state retirees a three percent increase in benefits, regardless of how much they lost when the exemption was eliminated.[3] *Id.* § 49–11–701(2). Moreover, the statute enacting the benefits increase does not prohibit the increase from vesting. Although the statute effecting Utah's benefits increase is entitled "Allowance increase to offset tax liability—Administration," a phrase which is admittedly similar to the one the *Vogl* court found objectionable, we cannot conclude that the title alone would render the benefits increase an impermissible tax rebate.

¶ 22 The Oregon Supreme Court's decision in *Ragsdale v. Department of Revenue*, 321 Or. 216, 895 P.2d 1348 (1995), handed down nearly four years before *Vogl*, illuminates the distinction between *Vogl* and this case. In *Ragsdale*, the Oregon Supreme Court considered the constitutionality of a benefits increase that, like Utah's, included "no mathematical correlation between taxes and benefits created," was funded through a contribution fund rather than through the state's general fund, and was not contingent upon a recipient's residency. *Id.* at 1350, 1356. The benefits increase was based on an employee's years of service, and not all retired employees benefitted from the increase. *Id.* at 1350. Despite a provision in the statute that terminated the increase in benefits if the state stopped taxing them, the court concluded that the benefits increase did not contravene intergovernmental tax immunity principles. *Id.* at 1353–54, 1357. *Vogl* did not overrule *Ragsdale*. *Vogl*, 960 P.2d at 383 ("We do not overrule *Ragsdale* or its analysis of the 1991 law."). Thus, even under the *Vogl* analysis, the Utah scheme would pass constitutional muster because it is similar to the scheme at issue in *Ragsdale*, which the *Vogl* court refused to overrule.

## CONCLUSION

¶ 23 We affirm the district court's decision to dismiss the retirees' action. We find nothing in 4 U.S.C. § 111 or *Davis* limiting a state's right to compensate its employees at levels of its own choosing. Moreover, the United States Supreme Court's decision in *Davis* implicitly suggests that increasing state retirees' retirement benefits would pass constitutional muster because such increases, unlike exemptions from state taxation, would be subject to federal taxation. Even were we to read *Davis*, as other courts have, to preclude any attempts to rebate the lost tax exemption through an increase in benefits, we would not invalidate Utah's increase in retirement benefits. Our reading of *Davis*, however, renders such an analysis superfluous.

¶ 24 Chief Justice DURHAM, Associate Chief Justice WILKINS, Justice DURRANT, and Judge WEST concur in Justice PARRISH's opinion.

¶ 25 Having disqualified himself, Justice Nehring does not participate herein; District Judge Brent West sat.

---

**3.** That the three percent increase is not a dollar-for-dollar tax rebate is illustrated by comparing its effects on state retirees with various levels of compensation. For example, for the highly compensated state retiree, the three percent adjustment is completely inadequate to replace the value of the lost tax exemption. At the same time, the meager pensions of the state's earliest retirees may not even be taxable because Utah exempts up to $4800 of retirement income. *Id.* § 59–10–114(3)(a). For this group, the three percent adjustment is simply a tax-free bonus payment.